# In the United States Court of Federal Claims

Case No. 96-408C
Filed: August 31, 2006
FOR PUBLICATION

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * | |
| **INNOVAIR AVIATION, LTD** | * |
| *Plaintiff*, | * Fifth Amendment, Takings, *In rem* forfeiture |
| v. | * |
| **THE UNITED STATES**, | * |
| *Defendant*. | * |
| * * * * * * * * * * * * * * * * * * * * | |

*Ty Cobb*, Hogan & Hartson, Denver, CO, for plaintiff. *H. Christopher Bartolomucci* and *Audrey E. Moog*, Hogan & Hartson, Washington, D.C., of counsel, for plaintiff.

*Sheryl Floyd*, United States Department of Justice, Washington, D.C., with whom were *David Cohen* and *Peter Keisler*, Asst. Att'y Gen., for defendant.

## OPINION and ORDER

**SMITH**, Senior Judge.

The Court has before it the parties' cross-motions for summary judgment on the matter of liability for the alleged taking of Plaintiff's property without just compensation and for an illegal exaction. With its cross-motion, the Defendant filed a Motion to Dismiss Plaintiff's illegal exaction claim for lack of subject-matter jurisdiction. For the reasons set forth below, the Court holds that the Government took Plaintiff's property without just compensation. Because the Court finds an uncompensated taking, it does not reach the Plaintiff's illegal exaction claim. Therefore, the Court **GRANTS IN PART and DENIES IN PART AS MOOT** the Plaintiff's Motion for Summary Judgment. The Court **DENIES** the Government's Cross-Motion for Summary Judgment and **DENIES AS MOOT** the Defendant's Motion to Dismiss.

# I. FACTS[1]

## A. The DC-3 Conversion Technology

The DC-3, also known by its military designation of "C-47" or colloquially as the "Gooney Bird," was produced in large numbers in the 1930's and 40's. By the 1980's, approximately 1,000 DC-3's remained in use, primarily in developing countries. The DC-3 has an extraordinarily strong airframe that was not subjected to the stresses of pressurization. Taking these factors into consideration, the Federal Aviation Administration (FAA) determined that the DC-3 had an unlimited life span. The major benefits of the DC-3 are that the strong airframe allows it to operate in rough terrain and that it is capable of utilizing short runways for takeoff and landing. The DC-3 also has several disadvantages. The original DC-3's are powered by piston engines that require an overhaul every 700 hours. These overhauls are costly and create down time for the aircraft. The piston engines are old, meaning that replacement parts and qualified maintenance personnel are expensive and difficult to find.

In the mid-1980's, two businessmen - Bryan Carmichael and Barry Wilson - began to investigate the potential of upgrading DC-3's in a way that would retain the plane's benefits and remove its weaknesses. Their plan was to replace the two piston engines of the original design with a pair of turboprop engines. They believed that this conversion would be far cheaper than designing a new airplane with comparable durability and operating capabilities. United States Aircraft Corporation (USAC) had developed a conversion that replaced the DC-3's piston engines with turboprops and made structural changes to accommodate the new engines. USAC had already obtained a One-off Supplemental Type Certificate (STC) from the FAA.[2] Carmichael and Wilson purchased the conversion technology from USAC and sought to obtain a Multiple Supplemental Type Certificate (MSTC) that would allow them to perform the conversion commercially.

To develop the conversion Carmichael and Wilson joined forces with the Basler Group, which was a family operated business run by Warren Basler. The Basler Group operated a fleet of DC-3's, employed experienced DC-3 mechanics, and owned a facility capable of performing the conversions. In joining together, two corporations were formed. Innovair Aviation Limited

---

[1] Prior to reaching this Court, this case had a long history in the federal judiciary. These facts are compiled from the opinions of the United States District Court for the District of Arizona and the parties' briefs. The District Court's first opinion, cited as "D. Ct. Op.," is included in Innovair's Proposed Findings of Uncontroverted Facts at Tab 1.

[2] When developing a significant modification to a type-certified airplane, the designer must first get a "one-off supplemental type certificate" from the FAA. This allows the modification of a limited number of aircraft. Additionally, the designer must perform significant testing and provide the data to the FAA. If the FAA determines that the design is safe, it then issues a Multiple Supplemental Type Certificate that allows an unlimited number of aircraft to be modified.

(Innovair), a Hong Kong corporation, was to perform all foreign sales and conversions except those under the Foreign Military Sales Act (FMSA). Basler Turbo Conversions (BTC), a domestic corporation, was to perform all domestic sales and conversions, and those under the FMSA. Carmichael and Wilson owned fifty-one percent of Innovair and forty-nine percent of BTC, while Basler owned fifty-one percent of BTC and forty-nine percent of Innovair. Carmichael oversaw the first step - the conversion of a prototype - in California. The prototype conversion was paid for with paid-in capital and shareholder loans, including substantial investments by Carmichael and Wilson.

The FAA issued the MSTC for the DC-3 conversion in February, 1990. BTC owned the MSTC and the parties executed the Technology Licensing Agreement (TLA) that is the subject of this lawsuit. Under the TLA, Innovair had the exclusive right to use the MSTC and related technologies for its foreign conversions and sales. The initial term of the TLA was ten years and provided for an automatic renewal for an additional five years unless either party provided written notice six months prior to the expiration of the term. TLA ¶ 3.13.[3] The TLA also provided for termination under certain enumerated circumstances. TLA ¶ 3.14. In return for the rights under the TLA, Innovair paid BTC an initial $300,000 and obligated itself to pay an additional $1,375,000 for a total payment of $1,675,000.

**B. The Air Columbia Contracts**

In December 1988, prior to the FAA issuing the MSTC, Innovair and BTC contracted with Air Columbia to provide six converted DC-3 aircraft. Air Columbia presented itself as a cargo carrier from Columbia. Two of the contracts were later cancelled, leaving Innovair and BTC to provide four aircraft to Air Columbia.[4] Once they got the MSTC for the conversion, Innovair and BTC proceeded with the conversion of the four aircraft for which they still had contracts. Among the contracts that remained was one for the conversion and sale of aircraft N95BF for $2.8 million.[5]

**C. United Technology Corporation Distributor Agreement**

In 1990-91,[6] Innovair entered a distributor agreement with United Technology Corporation (UTC), one of the largest airplane part manufacturers in the world. UTC was interested in marketing the conversion for several reasons. First, the conversion used engines manufactured by UTC.

---

[3] The TLA is included in the Government's Appendix at Tab 2.

[4] There were delays in delivering the aircraft, due to the delay in obtaining the MSTC and delayed progress payments from Air Columbia, that led to the cancellations.

[5] Although Innovair originally sought compensation for the loss of N95BF, it has since received full compensation for N95BF. Therefore, the seizure of N95BF is no longer considered for establishing liability or determining just compensation.

[6] There was a preliminary agreement in 1990 and a seven-year agreement in 1991.

Second, UTC had obligations to transfer technology to certain countries as a condition of previous sales and UTC could perform the conversions in those countries to satisfy its obligations. The agreement granted UTC the exclusive right market and sell the conversion technology in most of Asia. In the agreement, UTC committed to purchase at least five conversions per year. To perform, UTC created a Taiwan subsidiary to market the conversion technology, contracted with an FAA-certified facility in Taiwan to perform conversions, and began marketing efforts.

**D. The Government Seizure and Forfeiture**

On August 2, 1990, the Government seized the four aircraft that were being completed for Air Columbia. Of the four planes, two were not yet completed. Prior to the seizure, Air Columbia had made progress payments to Innovair for the conversion of N95BF, which was one of the planes that the Government seized. In November, 1990, the Government instituted an *in rem* action against the four Air Columbia aircraft. The Government asserted that Air Columbia was nothing more than a front for one of the Columbian drug cartels and had used the proceeds from drug sales to purchase the aircraft.

By the time of the seizure, relations between Basler and Innovair had deteriorated. On July 12, 1991, the controller of Basler Flight Services (BFS), which was also owned by the Basler Family, called the Government and informed it that Innovair had used a portion of the Air Columbia money to pay the balance owed to BTC under the TLA. During the call, BFS indicated that if the Government seized the TLA and turned it over to BFS and BTC, then BTC would complete the conversion of N95BF and sell it on the Government's behalf. A few days after the BFS's call to the Government, on July 16, 1991, the Government amended the complaint to include the TLA as a defendant. The Government alleged that $1,375,000 of the $1,675,000 Innovair used to pay for the TLA were proceeds traceable to Columbian drug sales. The Government, however, never alleged that Innovair knew, or should have known, of the origin of the funds Air Columbia used to pay for the conversions.

After the Government amended the complaint to include the TLA, the Government and BTC executed a stipulation in which BTC got complete ownership of the TLA and BTC posted a substitute *res* bond of $1,375,000. The *res* bond stipulation states that the bond was "in place of the sum of $1,375,000 paid by Air Columbia to Innovair," and subsequently paid by Innovair to BTC. Res Bond Stipulation ¶ 11. This sum was to secure the Government's interest in the TLA. D. Ct. Op. at 20, 23. In addition, BTC agreed to complete the conversion of N95BF, sell it, and pay the Government an amount equal to Air Columbia's interest in the airplane. Over Innovair's objection, the Arizona District Court reviewed the agreement and approved the substitution of the *res* bond for the TLA. The approval meant that the TLA was turned over to BTC and, as the Ninth Circuit stated, "Innovair's rights in the TLA were terminated at that point, . . . no matter how innocent it was." *United States v. Basler Turbo-67 Conversion DC-3 Aircraft*, No. 94-16876, 1996 WL 88075, at *2 (9th Cir. Feb. 29, 1996) [*Basler I*]. All claims to the TLA were transformed into claims against the *res* bond.

### E. The Arizona Litigation

After the approval of the stipulation, by which BTC obtained the TLA, Innovair filed suit in Arizona. The district court granted the Government summary judgment with respect to both the TLA and N95BF. The district court determined that Innovair lacked standing to challenge the forfeiture. On appeal, the Ninth Circuit reversed, finding that there was "not a shard of evidence that Innovair had any knowledge whatever of any improper source for Air Columbia's funds, and the government does not appear to argue to the contrary." *Bassler I*, 1996 WL 88075, at *1. The Ninth Circuit made clear that to the extent that Innovair was genuinely unaware of the source of the Air Columbia money, the money was free of taint and not subject to forfeiture. *Id.* The Circuit also rejected the district court's standing conclusion, finding that Innovair had a clear interest by way of the valid executory contract rights it held under the TLA.

On remand, the district court granted Innovair summary judgment because Innovair was an innocent owner of the TLA and the interest in N95BF. Further, the district court found that Innovair had an ownership interest in the TLA, consisting of the $300,000 paid up front, $1,375,000 subsequently paid, and an expectancy interest. In January 1999, the district court entered a judgment for Innovair in the amount of $2,104,206, which accounted for the value of the TLA, N95BF, and some prejudgment interest. The case again went to the Ninth Circuit, which vacated in part and remanded. This time, the circuit again agreed that Innovair should prevail, but held that the district court only had jurisdiction up to the amount of the *res* bond. On remand, the district court awarded Innovair $1,783,879.25, the amount of the *res* bond plus prejudgment interest.

### F. The Wisconsin Litigation

Innovair and Basler also sued each other in Wisconsin, contesting their obligations and performance under the TLA. The ownership of the TLA also became an issue in that litigation. Before the Wisconsin court resolved the issues, Innovair and BTC settled the case. Under the settlement agreement, BTC retained all ownership rights to the TLA except that Innovair retained the right to bring an action against the Government for the taking of the TLA.

### G. Procedural History in this Court

Innovair filed its complaint in this Court on July 10, 1996, alleging that the Government had taken the TLA and not paid just compensation. This Court stayed this action in 1998 pending the outcome of the second appeal to the Ninth Circuit. In 2002, this Court lifted the stay and denied the Government's motion to dismiss. After the stay was lifted, this Court, in "an abundance of caution" ordered the parties to address whether the Federal Circuit's decision in *Vereda v. United States*, 271 F.3d 1367 (Fed. Cir. 2001), foreclosed this action. In *Vereda*, the Federal Circuit determined that the Court of Federal Claims lacks jurisdiction over a substantive challenge to a seizure under the Controlled Substances Act (CSA). This Court noted that this case does not present that issue because the Ninth Circuit, the court with jurisdiction to review the merits of the forfeiture, has clearly held that Innovair was an innocent owner of the TLA and therefore the TLA was not subject

to forfeit. This Court's opinion then directed the parties to address the taking issue.

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party must show that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party must also establish the elements of the claim for which summary judgment is sought. *Id.* at 322. Further, summary judgment "may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." RCFC 56(c). The fact that this is a takings claim does not limit the availability of summary judgment. *Avenal v. United States*, 100 F.3d 933, 936 (Fed. Cir. 1996).

### B. The Takings Clause of the Fifth Amendment

The last clause of the Fifth Amendment states "nor shall private property be taken for public use, without just compensation." U.S. CONST. amend V, cl. 4. While the Government may take private property for public use, the amendment ensures that the Government may not do so without paying the dispossessed owner. In analyzing a claim under the Takings Clause, the Court will apply the three-part test set forth in *Osprey Pacific Corp. v. United States*, 41 Fed.Cl. 150 (1998). First, the Court must determine whether the Plaintiff had a property interest in the property taken. *Id.* at 154. Second, the Court must determine whether the Government action constitutes a taking for the purposes of the Fifth Amendment. *Id.* Finally, if the Court determines that a taking in fact occurred, the Court must then determine just compensation. *Id.* In this case, the Court is dealing solely with the issue of liability. Therefore, it will not address the third part of the *Osprey Pacific* Test. That will be addressed in subsequent litigation or by stipulation of the parties.

#### 1. Innovair's Property Interest

Innovair bases its claim on a valid ownership interest in the TLA, noting that it paid $300,000 and obligated itself to pay an additional $1,375,000 for the rights it held under the TLA. Pl. Mot. at 19. Innovair also paid a portion of the additional $1,375,000 owed to BTC under the TLA.[7] As the Ninth Circuit stated, "there can be no doubt that [the TLA] was a valid executory contract in which each party agreed to perform certain acts and as to which both parties performed in part." *Basler I,* 1996 WL 88075, at *2. It is equally clear that contract rights qualify as a property interest for the purposes of a Fifth Amendment claim. As the Supreme Court stated: "Valid contracts are

---

[7] Although there is a dispute as to the actual amount paid by Innovair, that issue is one for the damages, not liability, phase of the trial. D. Ct. Op. at 47; *but see Basler I*, 1996 WL 88075, at *2. Because there is no dispute that Innovair did, in fact, pay at least some amount to purchase the TLA, Innovair held a compensable property interest in the TLA.

property, whether the obligor be a private individual, a municipality, a state, or the United States." *Lynch v. United States*, 292 U.S. 571, 579 (1934).

Although it is clear that Innovair held its property interest at the time of the seizure, the Court must determine if Innovair maintained that interest at the time of the forfeiture. The Government raises two arguments why Innovair did not possess a property interest in the TLA at the time of the forfeiture. First, the Government argues that BTC terminated the TLA after the seizure but prior to the forfeiture. Second, the Government argues that the settlement between Innovair and BTC in the Wisconsin litigation terminated Innovair's property interest beyond the interest in the *res* bond. Each will be addressed in turn.

### a. BTC's Termination Letter

On September 3, 1991, BTC sent a letter to Innovair stating "that BTC is terminating the Technology Licensing Agreement dated June 24, 1988" for enumerated alleged breaches of the TLA. Def. App. at 63. The Government argues that BTC effectively terminated the TLA with only the September 3, 1991 letter, leaving Innovair without any interest in the TLA at the time of the forfeiture. Innovair contends that the September 3 letter was ineffective under the express terms of the TLA. This issue was never resolved by the courts in Arizona or Wisconsin. This Court, however, may resolve this issue on a motion for summary judgment because contract interpretation is a matter of law, not fact. *Giove v. Dep't of Transp.*, 230 F.3d 1333, 1340 (Fed. Cir. 2000). The TLA's termination clause states that, under certain circumstances, a non-breaching party:

> [M]ay at its election serve upon the party in default written notice of intention to terminate this Agreement, specifying the alleged default. If the party in default shall not cure the default so specified within ninety (90) days thereafter, then the other party may cancel and terminate this Agreement without any court action by *serving on the party in default written notice of its election to do so.*

TLA ¶ 3.14 (emphasis added). When interpreting the terms of a contract, the Court will give meaning to the objective intent of the parties as demonstrated by the text of the contract. *Giove*, 230 F.3d at 1340 (citation omitted). The emphasized text above clearly states that a termination is not effective until the terminating party serves written notice of its election after the ninety-day correction period.[8] The Government's argument that the single writing could terminate the TLA discards the emphasized text. However, the Court must interpret the contract in a way that "'gives meaning to all of its provisions and makes sense.'" *Giove,* 230 F.3d at 1340 (quoting *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996)). Without regard to the merits of the alleged defaults, the fact that BTC never sent a second writing to Innovair is dispositive. BTC sent the September 3 letter, which the Court may construe–at most–to be the requisite written notice

---

[8] Because no court dealing with this case resolved the legal effect of the termination letter, termination by "court action" is not applicable.

of BTC's intention to terminate. The record indicates that BTC did not send, much less serve upon, Innovair any follow-up letter. Because BTC failed to finish the termination process set forth in the TLA, BTC's attempt to terminate the TLA on September 3, 1991 was legally ineffective. Therefore, Innovair's property interest was undisturbed by BTC's September 3 termination letter.

### b. Settlement of the Wisconsin Case

The Government also argues that the settlement of the Wisconsin litigation extinguished Innovair's property interest in the TLA. According to the Government, the settlement reduced Innovair's interest in the TLA to the *res* bond. Def. Opp. at 11, 28-29. The Plaintiff argues that this settlement did not limit its ability to pursue its taking claim before this Court. According to Innovair, the settlement relinquished Innovair's interest in the TLA, but reserved the right "to exclusively assert a claim against the U.S. Government in the approximate amount of $1,375,000 (the 'Substitute Res'), relating to the U.S. Government's seizure of the [TLA]." Def. App. at 67. Regardless, according to the Plaintiff, the settlement is an agreement between Innovair and BTC regarding their rights against each other, not limiting Innovair's rights against the Government. Finally, Innovair argues that the settlement could not have impacted the character of the Government's action because it took place after the forfeiture.

The Court notes that the Government made these same arguments to the Arizona District Court and had them rejected there. This Court rejects them as well. The fact that Innovair expressly retained the right to file this action against the Government establishes that it retained an interest in the TLA after the settlement. Further, the subjective and approximate valuation of the claim stated in the settlement agreement does not limit Innovair's claim in this Court. *See* D. Ct. Op. at 44-46 (rejecting the Government's attempt to employ offensive collateral estoppel); *Basler I*, 1996 W.L. 88075, at *3.

As stated above, the Court concludes that Innovair held a valid property interest in the TLA as of the time of the seizure and maintained it until the forfeiture. Indeed, the Ninth Circuit was "mystified by the government's assertion that when it seized the TLA it seized something in which Innovair had no legal interest." *Basler I*, 1996 WL 88075, at *2. Therefore, the Court will proceed to the second phase of the *Osprey Pacific* analysis.

### 2. The Government Action

The second part of the *Osprey Pacific* Test is to determine whether the Government action constituted a taking for the purposes of the Fifth Amendment. If there was no taking, then the Plaintiff would not be due any compensation and its claim must be dismissed. For the reasons set forth below, the Court finds that the Government's actions in this case make this a *per se* or categorical taking under the Fifth Amendment.

The Court starts with the basic premise that the Government has broad, but not unlimited, power to forfeit private property under the Controlled Substances Act without giving rise to a Fifth

Amendment taking. The Supreme Court made this clear when it stated that "[a]lthough Congress designed the drug forfeiture statute to be a powerful instrument in the enforcement of the drug laws, it did not intend to deprive innocent owners of their property." *United States v. James Daniel Good Real Property*, 510 U.S. 43, 55 (1993). When the forfeiture took place, the law then in effect subjected to forfeit:

> All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter, *except that no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.*

21 U.S.C. § 881(a)(6) (1988) (*amended* 2000)(emphasis added).[9] As noted above, the Ninth Circuit held that Innovair was an innocent owner and, therefore, the TLA was not subject to forfeiture. That decision is binding upon this Court for this action. *See, e.g., Mother's Restaurant, Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1569 (Fed. Cir. 1983). As this Court stated in 2003, "under normal circumstances, [this] would entitle Innovair to the return of its seized property." *Innovair Aviation, Ltd. v. United States*, 58 Fed. Cl. 560, 561 (2003). Had the property been returned, then this case would likely have been over without compensation due to Innovair. *See United States v. One (1) 1979 Cadillac Coupe De Ville*, 833 F.2d 994 (Fed. Cir. 1987) (reversing the district court's award for the depreciation of a car's value during the time it was held until returned to its owner after the owner was judged an innocent owner). However, the return did not occur in this case.

### a. The Type of Taking

At the outset, the Court must determine what approach to use in deciding whether a taking took place. When the Government permanently appropriates even a small portion of property, that is a *per se*, or categorical, taking. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982). In that narrow circumstance, the Government is required to pay compensation and the court does not look to any other factors or interests. *Id.* In the much more common case, however, Government regulation merely decreases the value of property or prevents the owner from making some use of it. In those cases, the Court must look to a number of factors, including the Government interest at stake, the economic impact of the regulation on the owner, and the owner's investment-backed expectations. *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 123-25 (1978).

---

[9] In 2000, Congress amended § 881(a)(6) and struck the emphasized language, which was the innocent owner protection. Civil Asset Forfeiture Reform Act of 2000, Pub.L 106-185, § 2(c)(2), 114 Stat. 202, 210 (2000).

Unless the factors weigh in favor of the owner, the Government regulation is not a taking and no compensation is due.

The Plaintiff argues that this is not a difficult case. According to the Plaintiff, the Government properly seized the TLA under the CSA and then forfeited it, thereby permanently dispossessing Innovair of any interest in it. But the Ninth Circuit subsequently determined that Innovair was an innocent owner. Once Innovair was judged an innocent owner, the TLA was not forfeitable and should have been returned. The TLA was not, however, returned to Innovair after this determination. Therefore, the Government has taken the TLA. The Government responds that the Court should not apply the *per se* rules; rather it should utilize the *ad hoc* approach commonly associated with regulatory takings. The Government asserts that courts are reluctant to apply the *per se* approach in personal property cases or where the police powers are at stake. Further, it argues that Innovair has failed to establish that the *per se* rules apply in this case and that taking the Government interests into account establishes that there was no taking in this case. The Government also argues that the forfeiture could not be a taking because it was approved by the Arizona District Court and that the mistaken application of the CSA cannot result in a taking.

In comparing this case to *Loretto* and *Penn Central*, the Court finds that this case fits best within the *Loretto* holding. *See Brown v. Legal Foundation of Washington*, 538 U.S. 216, 235 (2003) (finding the *per se* rules a "better fit" than the ad hoc analysis). Here, through the forfeiture, the Government permanently dispossessed Innovair of its entire ownership interest in the TLA. As stated above, the TLA was not forfeitable. Therefore, it is no defense to say, as the Government does, that the Government was acting under the CSA. This case would have fallen within *Penn Central* if, instead, Innovair were seeking to recover for the loss of the TLA during the time between the valid seizure and the forfeiture. *See Basler I*, 1998 WL 88075, at *2. The *Penn Central* approach deals with government action which reduces the value of property, generally by regulation. Here we have the total destruction of the Plaintiff's property. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992). It is, therefore, puzzling why the Government filed its Notice of Supplemental Authority regarding *Bass Enterprises Production Co. v. United States*, 381 F.3d 1360 (Fed. Cir. 2004). *Bass Enterprises* applied the ad hoc approach because that case dealt with a temporary regulatory taking. *Id.* at 1365. This case does not.

### b. Arguments Against Applying *Per Se* Rules

The Government makes numerous arguments that courts are "reluctant" to apply *per se* rules to personal property. Reply 13-14. The Court, however, does not see any reason to make a distinction between real and personal property in determining whether to apply *per se* rules. In *Nixon v. United States*, 978 F.2d 1269 (D.C. Cir. 1992), the D.C. Circuit rejected the Government's argument that *per se* rules should be limited to real property. The *Nixon* Court wrote that:

> [T]he Government's inference that the per se doctrine must be limited to real property is without basis in the law, and we see no reason to give it one. One may be just as permanently and completely

>dispossessed of personal property as real property. Any distinction along these lines would be purely artificial.

*Id.* at 1285. The *Nixon* Court noted, however, that the Supreme Court had never applied the *per se* rules to a case involving personal property, but that there was no rationale precluding such an application. *Id.* That is no longer the case because the Supreme Court has, in the years since *Nixon*, applied *per se* rules to cases involving personal property. In *Brown v. Legal Foundation of Washington*, 538 U.S. 216 (2003), the Court analogized the taking of interest on client funds to the taking in *Loretto*, finding that it was a better fit than the *ad hoc* approach because the personal property was permanently dispossessed. *Id.* at 234-35. The Government responds that this case is not "similar" to *Nixon* and, therefore, the Court should not follow it. However, the case is identical in the important sense that the Plaintiff's personal property was permanently and completely appropriated by the Government.

The Government also argues that the courts are reluctant to apply *per se* rules when the police powers are at stake.[10] Here, the Government's reliance on state law takings cases is misplaced. The Government argues that cases like *Bennis v. Michigan*, 516 U.S. 442 (1996) and *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663 (1974) establish that the property of an innocent owner may be forfeited because, in those cases, neither innocent owner recovered their interest in forfeited property. In *Bennis*, a man was convicted of using his car to facilitate prostitution, and his wife, an innocent owner, unsuccessfully sought to recover her interest in the car. *Bennis*, 516 U.S. at 453. Similarly, in *Calero-Toledo*, an innocent yacht leasing company was also unsuccessful in recovering its interest in a yacht leased to a third party that was forfeited because it was used in transporting marijuana. *Calero-Toledo*, 416 U.S. at 680. Nobody, however, is challenging the proposition that property put to illicit use can be forfeited without subjecting the Government to liability. That issue is not before the Court because the TLA was never put to illicit use and not subject to forfeiture. The Government argues that the fact that the TLA was not put to criminal use is irrelevant because *Calero-Toledo* states that the forfeiture may serve the Government interest in deterring transactions with "those who may be engaged in illegal activity." Reply at 16. This argument fails because it presumes that the property was forfeitable due to illicit use, like the transportation of marijuana in *Calero-Toledo*. In this case, it was conclusively established by the Ninth Circuit that the property at issue was in no way subject to forfeiture because Innovair was an innocent owner under the statute. *Basler I*, 1996 WL 88075, at *1. Therefore, the Government argument that the TLA is forfeitable as proceeds of drug sales is foreclosed. It contorts *Calero-Toledo* to read it to support the proposition that property Congress determined not to be subject to forfeiture could be forfeited to promote secondary deterrence.

---

[10] Although the Government argues in terms of the "police power," it appears that the argument is focused on the Government's law enforcement power, not the broader police power. *Loretto* forecloses the argument that the Court should be reluctant to find a taking when the broader police powers are at stake. *Loretto*, 458 U.S. at 425-26.

### c. The Remaining Arguments

The Government next argues that because the forfeiture would not be a taking if it were proper, then the mistaken application of the CSA cannot constitute a taking. In support of this argument, the Government points to *In re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 799 F.2d 317 (7th Cir. 1986). In *Chicago Milwaukee*, a statute required that the district court accept a bid on the sale of railroad assets for constitutionally sufficient compensation. When the district court accepted a bid, which was not the highest bid, the Seventh Circuit held that there was not a taking. The Circuit reasoned that if the bid had been constitutionally sufficient there could not be a taking. *Id.* at 326-27. If the district court erred in valuing the rail assets, that was merely a mistake compensable in tort, but not a taking. *Id.* Innovair responds that *Chicago Milwaukee* does not support the Government's position because there never was a valuation in this case to protect Innovair's interest, only one to protect the Government's interest. The Court agrees that *Chicago Milwaukee* does not control this case because there was never a valuation of Innovair's interest in the TLA. As noted above, the valuation of the TLA was to protect the Government's interest, not Innovair's. Further, the Court must note the consequences of accepting the Government's argument. Carrying the Government's argument to its conclusion is to show why it is wrong. The Government's argument would allow the Government to seize and forfeit the property of any person. Then it would allow the Government to dispose of the property before there is any chance for a substantive review of the forfeiture. This would leave the innocent owner without a remedy. Congress clearly did not intend this result when it included the innocent owner provisions in the CSA.

The Government also argues that there cannot be a taking in this case because "[t]he Arizona district court, not the Government, had the final authority to approve the posting of the *res* bond and the release of the TLA." Reply at 5-6. This argument is untenable. The judiciary is just as much a part of the Federal Government as the legislature and the executive. The Fifth Amendment makes no distinction between the branches. As the Seventh Circuit noted, the Amendment "addresses the United States as an entity. If the United States adopts a policy that takes property, it should not matter that a judge is the instrument of that policy." *In re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 799 F.2d at 324. This argument also fails to account for the executive's role in the forfeiture. It was the Department of Justice, not the district court, that negotiated, drafted, and entered the substitute *res* bond that completely and irrevocably transferred the TLA to BTC. Finally, the failure to return the improperly forfeited property, not its initial forfeiture, is the gravamen of the Plaintiffs' case.

### C. Just Compensation

The Government also argues that there was no taking in this case because Innovair received just compensation for the TLA in the substitute *res* bond, which accounted for the amount Innovair committed to pay for the TLA. Innovair responds that this case is about its assertion that the TLA has value beyond the *res* bond. As it stands now, the Court does not have before it a valuation of Innovair's interest in the TLA. The Ninth Circuit noted that:

> [W]hat Innovair paid is not necessaily, or even particularly, a proper measure of what its rights are worth. The annals of economic history are replete with instances where people paid very little for an asset that ultimately made them a fortune, or paid a fortune for an asset and lost it all.

*Basler I*, 1996 WL 88075, at *2. Therefore, until there is a proper valuation of Innovair's interest in the TLA, which will take place in the damages phase, the Court cannot determine whether Innovair has received just compensation. Of course, any award will take into account the fact that Innovair's claim is for value above the amount of the substitute *res* bond. As it stands, however, the Court is deciding summary judgment and must, therefore, read the facts not clearly discredited in the light most favorable to the non-movant and make all reasonable inferences in the non-movant's favor. Here, this means that the Court must accept the Plaintiff's assertion that the TLA is worth more than the amount Innovair paid, or committed to pay, for it. The Court would note, however, that the district court, albeit without jurisdiction, did find value in the TLA above the value of the *res* bond. Because the Court must, for the purpose of the Government's motion, accept this valuation of the TLA, it necessarily follows that Innovair has not received just compensation for the TLA in the substitute *res* bond.

### III. Conclusion

For the reasons set forth in this opinion, the Court holds that Innovair retained its ownership interest in the TLA at the time of the forfeiture. The forfeiture of the TLA resulted in a compensable taking for which Innovair is due just compensation. Because there was a compensable taking, the Court does not reach the illegal exaction claim. Therefore, the Court **GRANTS IN PART and DENIES IN PART AS MOOT** the Plaintiff's Motion for Summary Judgment. The Court **DENIES** the Government's Cross-Motion for Summary Judgment and **DENIES AS MOOT** the Defendant's Motion to Dismiss.

The parties are hereby **ORDERED** to contact the Judge's law clerk to set a time and date for the parties to participate in a telephone conference in order to discuss the potential for stipulating damages or, if necessary, set a schedule for the damages phase of this litigation.

**It is so ORDERED.**

                                                           s/ Loren A. Smith
                                                           Loren A. Smith,
                                                           Senior Judge